The next case on the call of the docket is Agenda No. 17, Case No. 127903, Roger Ivey v. Transunion Rental Screening Solutions, Inc. Mr. Jason Robert Vandell, you may proceed. May it please the Court. My name is Jason Vandell, and I represent the appellant, Hewlett Strategies, LLC. This case involves the proof required to prove the lost profits of a new business. As courts have said, lost profits will always, to a certain extent, be uncertain and incapable of calculation with mathematical precision because they involve an unknown. Courts have also said that new businesses have a difficulty establishing lost profits because those businesses are new and there's no track record of profits to show what these future lost profits may be. However, there is an exception to the new business rule that allows a new business to recover its lost profits when it can prove those lost profits with a reasonable degree of certainty. And courts have said that this reasonable degree of certainty is essentially that the evidence upon which those lost profits are calculated are not based on speculation, i.e., they're based on facts, reliable data, etc. Here, the appellant, Hewlett Strategies, LLC, and for ease of reference, I will refer to it as Helix, has submitted a substantial amount of evidence of its lost profits to overcome the new business rule. Counsel, as I understand, there's a limitations clause in the contract. Are you precluded from recovering damages unless there is willful or intentional conduct on the part of the defendant? That is true. And there was a summary judgment motion on that issue. Actually, at first, the procedural history here is quite long. At first, there was a summary judgment motion granted on the limitations of liability provision. And then there was an appeal that was dismissed because there was some sort of defect in the order. And in the interim, this court decided the home health care versus chest case, which we brought to the attention of the district court. And the district court relied on that decision to actually rule that the evidence that we had submitted of willful and intentional wrongdoing created a triable issue of fact. And that's, I'm skipping ahead to where I'm going, but the courts look at the totality of the circumstances in deciding whether lost profits should be recovered. And that's an important factor that should be determined here. Pursuant to the express terms of the marketing agreement at issue, Helix cannot recover its lost profit damages in this case unless it actually proves willful or intentional wrongdoing. So if this case is remanded and we go to trial, a jury will only get to the question of damages if it first answers that question, yes, there was willful or intentional wrongdoing. So any lost profit damages awarded in this case will be predicated on a finding that there was willful or intentional wrongdoing in this case. And that willful and intentional wrongdoing of the appellee, which included an intentional breach of the agreement where they simply chose not to perform, even though the agreement was expressed and said that the appellee would perform. They opted to focus on their own priorities, as they put it, and the parent company of the appellee, TransUnion, the large credit reporting company, refused to put the resources necessary for them to comply with that agreement. And that's part of the basis of our allegations and evidence of willful and intentional wrongdoing. So where the new business rule is avoided, the cases involve existing markets, existing products, existing businesses or platforms. How is that met here? I know you're looking at the NAA leases, but aren't they totally different? I mean, this is a new lease product that's never been put out before. How can you compare that to this kind of standardized form lease that is sold to, and not to the general public, just to members of the NAA? Well, in the affidavit of Roger Ivey, who's the founder of Helix, and was actually on the NAA lease committee, and he was intimately familiar with this NAA lease, which was, at the time this agreement was executed, in 2009, was basically the electronic lease product available. If you wanted to go on the Internet and buy an electronic lease, rather than go to your local lawyer, the NAA lease product was the product. The principal of Helix was on that committee, and his affidavit states that the NAA lease product was the product. The NAA lease and the Helix lease function substantially similar. A lease is a regulated instrument. It has a lot of the same terms. It has to have, obviously, the name of the tenant, the landlord, the term, the rent, et cetera. But what Mr. Ivey did when he formed Helix was he did. He took the complaints he had heard about the NAA lease and make it better. He tried to address these concerns. That doesn't change the fact that the NAA lease was a very profitable product. In 2007, the NAA made $10 million a year selling the NAA lease. And that's considered by the experts that have provided the opinions here. In support of our lost profit damages, there's the affidavit of Mr. Ivey himself, who was on the NAA lease committee, very familiar with the NAA lease, very familiar with the selling of an electronic customized lease. There's also an expert opinion written by an attorney named Paul Cohen, who was also on the NAA lease committee. And he opined as to the large demand for this product. And then there's the opinion of Dr. Stan Smith, who holds a Ph.D. in economics from the University of Chicago. He used reliable market data. He looked at the market for leases in general by looking at the U.S. census numbers on the number of rental units. And he came up with what he estimated to be a small market share. He thought that since the Helix lease would essentially be second to market here, now, as Mr. Cohen pointed out, it's going to be a small market share. As he pointed out, you have at least 17 other relatively large companies selling these electronic leases, including companies you'd know like Zillow. Zillow sells an electronic lease. There's another company called RealPage. They're considered somewhat of an industry leader in property management. They sell an electronic lease. And that's why further evidence of the demand for this product is a gentleman by the name of Mike Britty, who is the head of the appellee. He was a Wharton grad who had started the appellee before the appellee was acquired by TransUnion. And Mr. Britty himself, despite being the former head of the appellee, he testified himself. At the time that this agreement was entered in 2009, there was a large demand for a lease product. And now we have the benefit of hindsight. The appellee often focuses on this being a new product, and we can't tell what a new product's going to do. No one knows what a new product is going to do, but now we know electronic leases, they do sell. You have multiple players in the industry doing it. Unfortunately, while Zillow is a public company, it doesn't have a specific light item in its revenue on its 10-K that says exactly how much money it makes. And so we don't have the evidence that we would love to have to prove our lost profits, but we think we've shown with reasonable certainty that these leases would have sold, and it's a question of a matter of how much. And I go back to one of the things I said earlier. These numbers can't be proven with no one will ever be able to figure out if the appellee had performed down to the cent exactly what these leases would have earned. I think that has to be acknowledged, but you can have estimates. And a case we rely on a lot is the Milex case. The expert there even had a range. That we were able to obtain evidence of and we have are the NAA lease, that is correct. And the Milex case, your client's lease, was not the same as the NAA lease, is that correct? It was not the same. It functions substantially similar. It has all the essential ingredients that are required to be in a lease, but changes were made by Mr. Ivy based on the complaints he had heard. For instance, the font was small, and so we increased the font. And legal size paper, and he would hear complaints from the people who bought the NAA leases that they didn't want their lease on legal size paper. Everyone wants something that's just on eight and a half by 11, especially since it's electronic. People need to be able to print it out, and no one wants to print out something on legal paper. And so those were the things. So yes, like any good businessman would, when Mr. Ivy started Helix, he didn't just basically plagiarize the NAA lease, he sought to make it better. He sought to address all the deficiencies he had heard. Again, Mr. Ivy was on the NAA committee, the attorneys that were responsible for creating this lease, so he knew the complaints. He knew, he helped draft the NAA lease. He knew what needed to be changed to try to have a better product. Would it be fair to say that in this situation, we're not looking at an instance where you were prevented from having a better product? From submitting certain evidence, it's just a matter of it was determined that it didn't establish what you need to establish to a reasonable degree of certainty? Well, I would say to a certain extent, the appellant was prevented from having some of the evidence, because the appellee breached. Had the appellee even started to perform, then we would have some idea what these leases would have done. But in light of the fact that the appellant drafted leases for all the states, he talked to local lawyers, he held up his end of the deal. That's what this is, a breach of contract action. The appellant upheld his end of the deal, drafted all these leases, made them available to TIRS. TIRS has the financial backing of TransUnion. They definitely had the resources to go onto their website. The small landlord product is on a website. The large landlord product is more, at the time in 2009, was more of on what I would consider to be like a database portal, like a program that can be accessed. And all TIRS was required to do, the appellee, was make these leases available. Change their website for the My Smart Move product, which is for the small landlords. Change the system for the large landlord products. So when these landlords go on to screen the tenants, which is another fact and circumstance that warrants a finding that this product would have done well. You have basically a built-in customer base here. You have... Sorry, I went on too long on answering the first part, why the evidence was available, but you're correct. I need to address that second part. I submit that an appellant has shown it with reasonable degree of certainty. Again, it can't be shown with mathematical certainty. Assumptions have to be used, and as the Milots court said, you can rely on assumptions, et cetera, from reliable market data. And that's what the experts have done here. They've created a financial model, they've estimated market share, they've estimated price. Both experts, when you read their opinions, believe that they use conservative estimates. Conservative estimates on market share, conservative estimates on the price that these leases would have been sold. Dr. Stan Smith, the price he uses is actually less than what the Helix lease, or what the NAA lease sold for. And I get that there's large numbers being asked for here. And so a knee-jerk reaction here could be, well, how can these be conservative estimates when these are eight-figure damage numbers? But the court needs to keep in mind, this was going to be a large-scale product. The appellee has a very large business. It had a very large built-in customer base. It wasn't just putting up a small website and hoping people come. Just someone starting a new business, new website, I hope people come and find us to buy our leases. This was TransUnion's rental screening product that thousands of landlords use. They go there to screen their tenants, they get a background check, they get a credit check. And then the way the system was designed is then they'd be able to add on and buy a lease. And so, again, when you look at the total facts and circumstances of this case, including the built-in customer base, the name recognition of TransUnion, a lease is a sophisticated product. If you're buying a sophisticated legal product and you're a mom-and-pop landlord, wouldn't you rather buy it from a company that's a subsidiary and has the name TransUnion there that you know? These are all these factors that support a finding that the lost profit estimates have been shown with reasonable certainty. One thing I'd like to talk about real quick is the impact and implication if the appellate court decision is affirmed. This court hasn't looked at the new business rule, I believe, since 2006. And this case will likely become the law of the land. And at least until it's looked at again. And given these facts that support... I'm out of time. Thank you. Thank you. Katherine Weiler. Good afternoon. May it please the Court? I'm asking that this Court affirm the sound ruling of the First District and find that the First District properly applied the new business rule as it stands in Illinois to the facts of this case. The new business rule has existed in Illinois for decades, and it's been consistently applied for many of those years. By every court of review in Illinois and by the Seventh Circuit interpreting Illinois law, it has been remarkably consistent. And the reason for that remarkable consistency is clear from Justice Hyman's well-reasoned majority decision in the First District's decision here. There is a straightforward rule. The new business rule says that in order to recover damages for alleged lost profits, a business must have been established prior to the interruption of its business. Full stop. Very simple. Very straightforward. And here, we were in fact dealing with a new business. However, Illinois courts and those courts recognizing and interpreting Illinois law have all agreed. That rule is not absolute. It is not a per se rule. It is not a rule without exceptions. It is a rule that is designed to be applied flexibly as appropriate to the circumstances. And that is why there is an exception to the new business rule. New businesses can recover lost profits if there is a non-speculative means of showing lost profits with reasonable certainty. And those are the fundamental principles that exist connecting those to the rule and the corollary. They're very consistent. They're seamless, in fact, in the sense that they speak to the same requirement. That in order to prove damages, whether a new business or not, those lost profits need to be established with reasonable certainty through evidence that does not rely on speculation or conjecture. And understanding the straightforward nature of that language, the consistent use of that language, and understanding the consistent description of both the new business rule and the corollary, that demonstrates why Illinois law and courts interpreting Illinois law have done so with remarkable consistency. Typically, in a case before this Court, there is extensive argument about some sort of split of authorities, be it in the Illinois appellate courts, be it in the way different circuits in the federal courts are interpreting Illinois law. There is some sort of disconnect. There is something this Court is being asked to clarify. Not so here. Here, these courts have applied the new business rule and its corollary rule consistently. And... No, Your Honor. There's not. There's not even a market, not even an existing market for it. At the time of the contract, no, there was not an existing market. And in fact, Justice Burke, the way you phrased your question at the start of opposing counsel's discussion is almost verbatim what I have written on my sheet of paper right here, which is, you need some sort of existing market. You need some sort of existing product. You need some sort of existing business. You need some sort of existing platform. If you are a new business seeking to establish your lost profits, because that is how you establish them with reasonable certainty and not resorting to some sort of speculation or conjecture. That speaks to exactly your question, Justice Burke. It's, is there a way for us to look at some sort of other existing product, some sort of other existing market, some sort of other existing business that can fix with reasonable certainty? Not definitively, not with absolute precision to the penny, but with reasonable certainty and not resorting to speculative evidence, is there a way to fix what those anticipated lost profits would be? And here the answer to that is no. Counsel, as I understand it, opposing counsel says, well, you've got the NAA lease and this is an improvement on it. Isn't that something the court can base damages on? Excuse me, Justice Silverstreet. It's not. And it's not for two reasons. The first is because Helix has acknowledged repeatedly and extensively throughout the record here that the NAA lease is not the same product. So first and foremost, it can't possibly say this is identical enough or similar enough to satisfy, again, reasonable certainty, non-speculative. And the reasons for that are in the evidence that was presented to the court. Helix, this is in Helix's expert, Mr. Cohen's report. It's at page C-2005 through roughly C-2012 of the record. He walks through a variety of reasons, Mr. Cohen does, why these NAA leases are separate and distinct from the Helix leases that are at issue here. They're fully customizable. The NAA leases were based on Texas state law, whereas the Helix leases were purportedly much broader based and could be applied in every single state. It's a distinction. The NAA platform, Mr. Cohen stated, was outdated, did not allow for customization, did not allow for the expansion of different fields of search. There were data fields that were not properly set up in that specific database. Landlords, as Justice Stice pointed out, had to belong to the NAA in order to obtain those lease agreements. The lease agreement was too long. There were click-per-lease charges. I could continue on. The list goes on. I doubt that these justices want me to. But those are the distinctions that are being discussed. In addition to that, Mr. Ivey himself, who is the owner of Helix, specifically described the Helix leases as opposed to the NAA leases as, quote, a different animal. They're not the same. They're not comparable. That's why Helix was so convinced of the value of its product, because they are distinct. The second point I want to make about this, Justice Overstreet, comes back to some questions that were being asked during the earlier discussion by opposing counsel. There is a concession that they're not identical, and there is recognition, as the Court will recall from the discussion about Zillow documents. Justice Holder-White, I believe you were the one who asked that you would agree that these leases aren't the same. And the answer to that question was, yes, we would agree to that. There was discussion about the specific evidence that was submitted to the trial court, and that discussion was that Helix wished that it could have presented evidence from a more analogous source like Zillow, but it was unable to do so. And instead, it relied on the NAA leases. Counsel, the fact, now this was a summary judgment proceeding. That's correct. And I believe many of the cases cited all went to trial. Is that correct, or did you have any other summary judgment cases? The Illinois cases primarily went to trial. The Seventh Circuit case that is also very analogous here, the Tass case, was a summary judgment case. Is that correct? So what significance is that? Of the procedural posture of the cases? There are obviously different issues that would come up during the process of litigating a breach of contract case. The Court, I'm sure, is painfully familiar with the requirements of pleading and proving a breach of contract case. There must be a valid and enforceable agreement. The plaintiff must have fully performed, the defendant must have breached, and there must be resulting damages. Many of these cases easily could have gone to trial because there was damages evidence. Both sides recognized there was damages evidence, but then based on the evidence as it came in at trial, the parties were arguing about whether or not that was sufficient. But in addition to that, it is worth noting, Justice Overstreet, it's not just a situation where these Illinois appellate court decisions were being made based on a jury's verdict. These aren't situations where the appellate court was affirming or reversing based on a jury's verdict. They were largely cases that were interpreting whether or not a post-trial motion, at times taking away a verdict or at times seeking a new trial, should be granted. And I think that that's particularly notable in the Mariturn Partners case. Mariturn Partners was actually the relevant portion because there were cross-appeals in Mariturn Partners. And I suspect, Justice Neville, you may recall this because you were one of the concurring justices in that case. In Mariturn Partners, there was a discussion about whether or not the trial court properly barred evidence of damages that are very similar to the type of damages evidenced at issue here. And the appellate court said the trial court properly made that ruling. So my point, which is probably made a little too long-windedly, Justice Overstreet, is that these are not cases that were decided where damages were decided by a jury. Nor should they be. And the same is true here. This is not a case that involves damages that should be evaluated by a jury.  of the new business rule as it has been defined for decades by Illinois courts and courts interpreting Illinois law. And it is entirely consistent with those decisions. Another of those decisions, straightforward application of the new business rule, Justice Tice, you may recall, as a concurring justice in S.K. Hantool. Same decision. Same analysis. The idea that if you are going to establish that there is an exception to the rule, again, the rule, a new business cannot recover lost profits, the exception that Illinois courts recognize, a business may be able to recover lost profits even if it's new as long as it can establish those lost profits with reasonable certainty. That did not apply in S.K. Hantool either. It does not apply here. And that is the bottom line for this court. Even Helix has acknowledged in its response papers that Helix is not looking for this court to come up with a different interpretation of the new business rule. It's not suggesting that this court has been improperly applying the new business rule, that the first district improperly applied conceptually the new business rule. Certainly Helix is arguing that it was improperly applied in this case. But not that the legal underpinnings of that rule are in error. There is no argument to that effect. Helix says in the reply at page 6, it isn't asking this court to adopt a blanket rule that expert calculations based on market data are always reliable. Instead, Helix is asking this court to uphold prior decisions stating that a new business venture may be awarded its lost profits where the circumstances warrant. That's exactly what the first district did here. It looked at the circumstances and it concluded that based on the facts of this case, the new business rule applies, the exception does not, and the circumstances do not warrant any different interpretation. We ask that this court affirm the appellate court's decision and reach the same result. Unless the court has any other questions for me. Thank you, Your Honors. Mr. Grendel. First, I'd like to address counsel's discussion regarding the market for this product. I think that depends on how you define the market. Markets really demand for a product. Is there a demand for the product? I know in the appellee's brief, they made the specific statement that there was no market for the Helix lease. And as we said was, well, that's defining the market too narrowly. That's effectively holding what is not required that we have evidence of an identical product. If we have to show that there was an actual demand for the Helix lease, the market should be, was there a demand for either, one could look at it broadly, leases in general, as we've said. Every landlord needs a lease, or more specifically, and what appellant has said here, what's the market for an electronic lease? No two businesses are going to make their electronic lease the same. What's the market for someone to go on the Internet to buy an electronic lease? And that, there is a substantial amount of evidence. There's the evidence of what the NAA is making, selling their lease product, and there's all these other businesses that have entered the market. That shows the market. And that's what the Milex case says. You need evidence of market, and then you need to calculate it. First, you have a demand for the product, and then how are you going to calculate how much it would make? And that's using assumptions based on authoritative data. Again, like at the district court level, the appellate court level, and now here, there's still been no challenge to the manner in which the appellant's experts calculated their damages. Using Internet conversion rates based on the traffic to the TIRST website, using, developing a market share and an assumption of what the lease would sell for, based on what the NAA was selling their lease for. There's been no challenge to, no one has said that, no one has said that the experts that provided opinions, that they were not credible. No one has said that the data that they relied on wasn't authoritative or credible or speculative. Counsel, opposing counsel mentioned toward the end for arguments that really you're not arguing for new business rules, for things to evolve in the law in Illinois. You're just arguing based on the facts of this case. Is that correct, or are you making some sort of argument that the new business rules should be modified in some respect in Illinois? Well, I think if you apply the test articulated in the Milex case and look at the totality of the circumstances, as we put forth in our brief, I think the law needs to be clarified. Because the argument I heard from opposing counsel was, again, basically, you need evidence of a nearly identical product. You need evidence of actual profits from a nearly identical product. And what we're saying is that's not the case. You look at the totality of the circumstances, and you look at the fact that there's a built-in customer base here. You look at the name recognition of TransUnion. You look at all those facts to determine whether it's at least enough to go to the jury. Here, as you pointed out, it was decided on summary judgment. Many of these cases, including the Milex case, talk about the credibility of the experts, the credibility of their testimony. All we have now is their reports. Their depositions weren't even taken. You know, when you say that this law should be clarified, then you're acknowledging, aren't you, that the laws that exist today doesn't account for these other factors that you mentioned that should be considered? Well, I think what I'm saying is there's a dearth of case law in Illinois. And there's not a case that I was able to cite where the crux of the evidence was more of a financial model. And so while it's looking at the totality of the circumstances, I would say that the legal test itself should say the same. It should be the totality of the circumstances. And is the evidence reliable? Are the experts credible? That statement of law should stay the same. But right now, those other factors that you just mentioned a minute ago or a couple minutes ago, they haven't been considered normally in this rule, have they, these other additional factors? Yeah, I would say, and that's what I'm trying to say, is the rule of law would stay the same. But, yes, this would be perhaps the first case where I believe the evidence in Melix is very similar because they did. Three years of the five-year estimate in that case were just projections. And they just showed the demand looking at the other generic drug, but they didn't actually calculate the loss, profit, damage. To establish the demand, correct. I mean, the exact same drug. They knew the number of prescriptions that were out there. Over a period of time, they knew the size of the prescriptions. I mean, you don't have that here. But the numbers, the projections, they did not have the income data from the other drugs they used. They used samples from what they said were similar drugs. And so, yes, and then also to the extent, and this is in our brief, to the extent that the court considers the wrongdoing of tariffs, I would have to acknowledge that would be an extension of the law. I saw no reported decision where that was factored in in allowing lost profits. How does that factor in? Because that's a sort of a different kind of element altogether. So you want to factor in the bad actor in this rule? So that has an impact on the rule. It has an impact on a rule. Is there some kind of presumption then that would be thrown into place? Well, yeah. And the rationale behind that would be that that's why we don't have the evidence. It's because of the intentional breach. We have an intentional breach, intentional wrongdoing. And that's why we don't have the evidence. So, yes, that's the reason I call that. You're asking for like a presumption because you're saying if that evidence is there, then something can be presumed. You don't have to show some other things because you've got that factor. I would agree with that if that factor is used, but I'd also say that that factor is not necessary, depending on how the evidence is viewed. In a way, it's sort of an alternative argument. Right. Okay. And it goes to what would be necessary to prove, right? If you prove that, you didn't have to prove that element. You wouldn't have to prove something else. I think to the extent that this number can't be proven as exactly as one would like, because there is no actual evidence of what these hold because of the intentional breach, then yes. And that would be the rationale. Unless there's other questions for me, I think I'm running out of time, and that's all I have. Thank you very much. Case number 127903, Roger Ivey versus Trans-Engine Rental Screening Solutions, Inc. will be taken under advisement as agenda number 17. Thank you, Mr. Vandell, for your argument this afternoon, and Ms. Weiler, the same.